IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GLORIA LASSITER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No. 3:07-1169 |
| | )   Judge Trauger |
| NEUROLOGICAL | ) |
| SURGEONS, P.C., | ) |
| | ) |
|     Defendant. | ) |
| | ) |

## MEMORANDUM

Pending before the court is the defendant's Motion for Summary Judgment (Docket No. 12.) For the reasons discussed herein, the defendant's Motion for Summary Judgment will be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

The defendant, Neurological Surgeons, P.C., is a neurosurgery clinic with eight locations in Middle Tennessee, Southern Kentucky, and Northern Alabama.[1] The defendant's business office is responsible for the billing for three different medical practices: the Howell Allen Clinic, the Saint Thomas Outpatient Neurosurgical Center ("STOPNC") and the Center for Spinal

---

[1] Unless otherwise noted, the facts are drawn from the parties' summary judgment briefs (Docket Nos. 13, 17, and 19), the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Docket No. 18) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

Surgery.  In July 2006, the defendant hired the plaintiff, Gloria Lassiter, to work in its business office as an administrative coordinator.  Prior to joining the defendant, the plaintiff had fifteen years of medical billing experience.  As administrative coordinator, the plaintiff was one of the defendant's financial "gatekeepers," that is, she was partially responsible for verifying that all of the charges for the day had been entered by the coding department (known as "closing" the day), submitting claims to insurers for payment, fixing errors in claims that had been rejected by an insurer (known as handling "accept/reject reports"), handling daily deposits, and managing the lockbox.

In January 2007, the plaintiff's supervisor, Cheryl Maplesden, resigned, and Shreka Rogers became the plaintiff's supervisor.  While the plaintiff had a good relationship with Maplesden, problems developed shortly after Rogers became supervisor.  On February 28, 2007, the plaintiff "closed" the business day for the STOPNC too early, that is, she failed to verify that all of the STOPNC charges for the day had been entered by the coding department, which caused a substantial headache for the defendant in terms of sorting out its accounting for the month.  On March 14, 2007, the plaintiff sent an e-mail to Rogers, asking for Rogers' help in prioritizing the plaintiff's tasks.  Rogers claims to have been "baffled" by the e-mail, as the plaintiff had been working for the defendant for eight months, and, in Rogers' view, should have had a grasp on how to organize her day.  (Docket No. 16 at 2.)

On March 15, 2007, the plaintiff received an assignment from Rogers to "pull secondaries," that is, pull the medical records necessary to process workers' compensation claims.  The plaintiff, apparently concerned that she was getting pulled into an area of work that she did

2

not want to do, interrupted a meeting Rogers was in to sternly object to this assignment. In the course of her altercation with Rogers, the plaintiff threatened to quit if she continued to get such assignments. Rogers informed the defendant's human resources department about the incident, and, shortly thereafter, Rogers, the plaintiff, and human resources director Marlese Allen had a meeting in which the plaintiff was instructed that insubordination would not be tolerated and that the plaintiff was obligated to accept tasks as assigned to her. The plaintiff apparently accepted this instruction and apologized for her behavior.

On March 19 or 20, 2007, the plaintiff learned that she was pregnant. Shortly thereafter, the plaintiff informed Rogers and Allen that she was expecting. It is agreed that Rogers and Allen were both supportive and pleasant on hearing the news. While there is no allegation that anyone at the defendant's office was hostile toward the plaintiff, the plaintiff testified at her deposition that her co-workers frequently asked her about how much time the plaintiff intended to take off for her pregnancy, conduct that the plaintiff termed "very frustrating." (Docket No. 15 Ex. 1 at 137.) When Rogers asked her how much time she intended to take off, the plaintiff told Rogers that, whatever her timetable for return, she would not leave Rogers "hanging" and would let Rogers know her plans well in advance. (*Id*. at 138.) While the plaintiff testified that Rogers was outwardly fine with this approach, the plaintiff has an admittedly "subjective" belief that other employees, who were friendly with those in management, were secretly reporting updates on the plaintiff's intentions "back to management," including Rogers. (*Id.* at 139-141.) The plaintiff, who was in her mid-40s at the time of her pregnancy and, therefore, needed to see her physician on a regular basis early in her pregnancy, also testified that, once she began needing to leave work

3

to see her doctor, her support level at work declined. (Docket No. 15 Ex. 1 at 155.)

On April 18, 2007, the plaintiff again informed Rogers that she needed assistance in dealing with her workload, in part because the plaintiff was training a new employee. Rogers, in an effort to help the plaintiff, offered to complete the plaintiff's block of "accept/reject" reports for March 23, 2007 to April 6, 2007. Prior to their conversation, Rogers did not know that the plaintiff had fallen behind on her "accept/reject" reports. On April 20, 2007, the plaintiff again asked Rogers for help prioritizing her work.

On April 24, 2007, Allen and Rogers met with the plaintiff and issued her a strongly worded, written warning. The warning cited the February 28, 2007 "closing" incident as having "caus[ed] our financial statement to be a mess," cited the plaintiff's three requests for help prioritizing, and said "[y]ou should be able to prioritize you [sic] work and accomplish all tasks without issues. Instead you are showing a decrease in productivity and understanding of your job. The inability to work independently and prioritize your day is unacceptable ... . Your position in the business office requires you be self-motivated and to work independently. Neither of which you have shown." (Docket No. 15 Ex. 2 at 4.) During the meeting, the plaintiff indicated that she believed that many of the problems she was having stemmed from a lack of training, and the meeting concluded with Rogers agreeing to provide the plaintiff additional training. Shortly after the meeting, which all parties describe as pleasant and professional, given the circumstances, the plaintiff became visibly upset. Rogers observed the plaintiff crying in the hallway and advised the plaintiff that she should go home for the day. The plaintiff called in later in the day and told Rogers that a physician had advised her to take three days leave. Rogers replied that it would be

4

fine if the plaintiff came back to work three days later, on April 27.

In her sworn affidavit, Rogers states that, the day after issuing the warning to the plaintiff, Rogers discovered that there were $93,000 in claims that the plaintiff should have submitted to insurers for payment but never did. Rogers states that she had no idea that the plaintiff was having difficulty submitting claims. Upon this discovery, Rogers contacted Allen and the defendant's CFO, Scott Butler, and all agreed that the plaintiff should be terminated. When the plaintiff returned to work on April 27, 2007, Rogers and Allen advised her of the defendant's decision to terminate her employment. The plaintiff's position was not filled, because, the defendant claims, other employees at the company were able to absorb the plaintiff's job duties.

On June 4, 2007, the plaintiff filed a complaint in the Circuit Court for Davidson County, Tennessee, alleging that the defendant had violated her rights under the Tennessee Human Rights Act (THRA) by discriminating against her based on her pregnancy. (Docket No. 1 Ex. 1 at 2.) On November 15, 2007, the plaintiff filed an amended complaint in the Circuit Court, alleging, based on pregnancy discrimination, violations of both the THRA and Title VII of the Civil Rights Act of 1964. (*Id*. at 16.) The defendant removed this case to this court, and, after discovery, on October 6, 2008, the defendant moved for summary judgment on all of the plaintiff's claims.

## **ANALYSIS**

The plaintiff claims that she was subjected to discrimination on the basis of her pregnancy in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Tennessee Human Rights Act (THRA), T.C.A. § 4-21-101 *et seq*.[2] The defendant has moved for

---

[2] The THRA, like Title VII, forbids workplace discrimination on the basis of one's pregnancy. T.C.A. § 4-21-101(a)(1).

5

summary judgment on the plaintiff's claims. For the reasons discussed below, the defendant is entitled to a judgment as a matter of law, and the defendant's motion will be granted.

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v.*

*Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II. The Plaintiff's Pregnancy Discrimination Claim

At the outset, it is important to clarify that the plaintiff's Title VII claim and the plaintiff's THRA claim are analyzed under the same standard. *Lynch v. City of Jellico*, 205 S.W.3d 384, 399 (Tenn. 2006). That is, where, as here, there is no direct evidence of discrimination, a pregnancy discrimination claim is analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Andrews v. E. Tenn. Children's Hosp. Ass'n*, Case No. 07-288, 2008 WL 4646115, *8 (E.D. Tenn. October 17, 2008). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination. *Id.* If the plaintiff establishes her *prima facie* case, the defendant may articulate a legitimate, non-discriminatory reason for the employment action, which the plaintiff may rebut with evidence that the explanation is pretextual. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000).

### A. *Prima Facie* Case

To establish her *prima facie* case of pregnancy discrimination the plaintiff must show: (1) that she was pregnant; (2) that she was subject to an adverse employment decision; (3) that she was qualified for her job and (4) that there is a "nexus" between her pregnancy and the adverse employment decision.[3] *Mullins v. U.S. Bank*, No. 07-4033, 2008 WL 4613543, *4 (6th Cir. Oct. 15, 2008) (citing *Cline*, 206 F.3d at 658; *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006)). One way for the plaintiff to establish this "nexus" is to show that there was a "temporal proximity" between her employer's learning of her pregnancy and the adverse employment decision. *Asmo*, 471 F.3d at 593. In *Asmo*, the court concluded that, because only two months passed between the employer's learning of the pregnancy and the employee's termination, "a link" or "nexus" was "establish[ed] ... between [the plaintiff's] pregnancy and her termination for

---

[3] In its brief, while conceding that "some courts" use the "nexus" language, the defendant primarily argues that the plaintiff cannot establish her *prima facie* case because she cannot show that she was replaced by someone outside of her protected class or that she was treated worse than a similarly situated employee. (Docket No. 13 at 6.) While a plaintiff could certainly establish a "nexus" between her pregnancy and her termination by comparing herself to another employee, Sixth Circuit precedent teaches that such comparison is not necessary in the pregnancy discrimination context. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006). Further, the defendant applies the wrong standard for showing a nexus by comparison. In its brief, the defendant contends that the plaintiff must show either that "she was replaced by someone outside of the protected class" or that a "comparable non-protected person was treated better" and that such comparable, non-protected person is "similarly situated in all respects," including having had the same supervisor. (Docket No. 13 at 6-7.) This is simply incorrect and the *Ensley-Gaines* case relied on by the defendant expressly rejects this standard. *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996). The *Ensley-Gaines* court stated that, "when a Title VII litigant alleges discrimination on the basis of pregnancy ... in order to establish a *prima facie* case of discrimination, she must demonstrate only that another employee who is similarly situated *in her or his ability or inability to work* received more favorable" treatment. *Id.* (emphasis added) Indeed, the court explicitly rejected a test that would require the plaintiff to compare herself with a person similarly situated "in all respects," including having had the same supervisor. *Id.*

8

the purposes of a *prima facie* test." *Id.* at 594.

Here, the plaintiff plainly establishes her *prima facie* case of pregnancy discrimination. There is obviously no question that the plaintiff was pregnant and that she suffered an adverse employment decision, *i.e.*, she was fired. While the defendant refuses to "concede" that the plaintiff was qualified for her position (Docket No. 13 at 6), Sixth Circuit precedent plainly teaches that, in assessing whether the plaintiff was "qualified," the court is to examine the plaintiff's employment record "prior to the events that spurred" the adverse employment action. *Cline*, 206 F.3d at 662. As the plaintiff had fifteen years of medical billing experience prior to joining the defendant's company, it is plain that she was qualified for this medical billing position. Finally, the plaintiff has also shown a "nexus" under *Asmo*, as she was terminated roughly one month after she advised her employer that she was pregnant. Therefore, the plaintiff here has established her *prima facie* case of pregnancy discrimination.

### B. Non-Discriminatory Reason For Adverse Action

As the plaintiff has established her *prima facie* case of pregnancy discrimination, the burden now shifts to the defendant to "rebut the presumption of discrimination by producing evidence that the plaintiff was [fired] for a legitimate, nondiscriminatory reason." *Cline*, 206 F.3d at 666. (internal quotation omitted). As discussed above, the defendant has repeatedly stated, both at the time of the plaintiff's termination and during this litigation, that the plaintiff was terminated because of a series of mistakes of varying severity and because of the defendant's increasing awareness that the plaintiff could not handle her job responsibilities. (Docket No. 13 at 8-9.) As the defendant states, "[b]etween February 2007 and April 24, 2007, [the] plaintiff had

9

demonstrated a substantial loss of performance, productivity and seemingly understanding of her job functions," as demonstrated by the STOPNC "closing incident," the plaintiff's repeated requests for help prioritizing her work, the plaintiff's unwillingness to communicate to her supervisor that she had fallen behind in her work, the plaintiff's erratic behavior as demonstrated by the "pulling secondaries" incident, and, what the plaintiff herself termed the "final straw," Rogers' discovery of $93,000 in un-transmitted claims. (*Id*; Docket No. 15 Ex. 1 at 159.)

On this record, the plaintiff concedes that "[n]o serious, well-informed and disinterested observer could be heard to say that the record does not, at minimum, show a colorable claim for a legitimate, non-discriminatory reason for the firing of Gloria Lassiter." (Docket No. 17 at 3.) In short, as the plaintiff concedes, the defendant has easily satisfied its burden to establish a legitimate, non-discriminatory reason for the adverse action. *Id*.

### C. Pretext

As the defendant has come forward with a legitimate, non-discriminatory reason for the adverse employment action, "the presumption of discrimination ha[s] been rebutted," and the burden now shifts back to the plaintiff to demonstrate that "the proffered reason[s were] not the true reason for the employment decision," *i.e.*, the plaintiff must produce sufficient evidence from which a jury could reasonably reject the employer's explanation as pretext for discrimination. *Cline*, 206 F.3d at 666. While there is no one way to demonstrate pretext, it is settled that the plaintiff may show pretext by showing that the articulated reasons either (1) have no basis in fact, (2) did not actually motivate the defendant, or (3) are insufficient to explain the defendant's actions. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000).

10

As a starting point, the plaintiff contends that the court should rely on the *Cline* case as "a precise blueprint" for analyzing the pretext issue. (Docket No. 17 at 4.) As *Cline* is an oft-cited, pregnancy discrimination case decided by the Sixth Circuit, the plaintiff is correct that the *Cline* court's analysis does provide the general guidance for how the court should resolve the pretext issue. It is also true that, in *Cline*, the court determined that the defendant was not entitled to summary judgment on the plaintiff's pregnancy discrimination claim. 206 F.3d at 668. *Cline*, however, involved a vastly different set of circumstances from those present here. In *Cline*, the plaintiff school teacher was supposedly terminated by her parochial school employer for having engaged in pre-marital sexual intercourse, a fact that was only revealed to the school by the teacher's pregnancy. *Id.* at 667. In finding that the school was not entitled to summary judgment, the court stated that "[school] officials acknowledged ... that Cline's pregnancy alone had signaled them that she engaged in premarital sex, and that the school does not otherwise inquire as to whether male teachers engage in premarital sex. ... These admissions raise an issue of material fact as to whether [the school] enforces its policy solely by observing the pregnancy of its female teachers, which would constitute a form of pregnancy discrimination." *Id*.

While *Cline* demonstrates how a plaintiff might raise an issue of material fact as to whether the defendant's explanation is pretextual, here, the plaintiff's pretext argument utterly fails to follow that "blueprint." Indeed, the plaintiff's pretext argument is solely based on the plaintiff's own speculation, speculation that is inconsistent with, or wholly unsupported by, the limited factual record before the court.[4]

---

[4] While the defendant filed with the court the Rogers affidavit, excerpts from the plaintiff's deposition, and the deposition of the plaintiff's former supervisor, the plaintiff did not

11

Mainly, the plaintiff speculates that the real reason for her termination was that the defendant did not want to run the risk of insuring her and her baby, as her pregnancy was considered "high risk," given the fact that the plaintiff was in her mid-40s at the time of her pregnancy. (Docket No. 15 Ex. 1 at 129, 142.) There is no independent support for this theory in the record, and the plaintiff's corroborating "evidence" for this theory is entirely rooted in her subjective feelings (1) that once she started missing work to go to the doctor her bosses became less supportive of her, and (2) that other employees were collecting information on her maternity leave plans and reporting them back to management. (*Id.* at 139, 155.)

In sum, in the face of numerous, undisputed, valid reasons for her termination, the plaintiff has offered nothing but unsupported innuendo as a pretext argument and certainly nothing that would cause a reasonable jury to reject the defendant's explanation for the termination decision. Indeed, contrary to the plaintiff's subjective feelings, the limited record shows that the plaintiff was well supported by her superiors. As of April 24, 2007, Rogers was volunteering to provide the plaintiff with additional training, despite all of the mistakes that the plaintiff had made in the previous two months. (Docket No. 15 Ex. 1 at 157.) Further, even assuming the truth of the plaintiff's wholly unsupported speculation that "management" was privately receiving inside information as to her maternity leave timetable, it is not clear how management's wondering when the plaintiff was coming back to work would indicate that management was preparing to fire the plaintiff. In sum, the plaintiff's argument that she was fired to save the defendant money on insurance costs is simply speculation, unsupported by a shred of evidence. As the plaintiff has

---

file any evidence in conjunction with her seven-page response to the motion for summary judgment.

12

failed to demonstrate that the defendant's articulated reasons for her termination are pretextual, the defendant is entitled to summary judgment on the plaintiff's Title VII and THRA pregnancy discrimination claims.[5]

## CONCLUSION

The plaintiff has failed to raise a genuine issue of material fact as to whether the defendant discriminated against her due to her pregnancy. As such, the defendant's Motion for Summary Judgment will be granted.

---

[5] The weakness of the plaintiff's case is amplified by exploring another contrasting case, *Asmo*, in which the court found that the plaintiff *had* raised a fact issue as to whether the defendant's explanation for the plaintiff's termination following her pregnancy announcement was pretextual. In *Asmo*, there were simply enough "suspicious" circumstances to raise a fact issue as to pretext, such as (1) that the plaintiff's supervisor was silent when the plaintiff announced her pregnancy to him on a conference call while everyone else on the call extended his or her congratulations; (2) that at least one other employee at the defendant's office encouraged the plaintiff to sue after she was fired, and (3) that the defendant's rationale for the termination shifted and changed over the course of the litigation. *Asmo*, 471 F.3d 595-98. While every case is different, nothing resembling those suspicious facts is found here. The evidence here shows that the plaintiff's termination was brought about by a series of missteps by the plaintiff, which occurred both before and after the plaintiff learned that she was pregnant.

13

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge